58.     As underwriters of the Note Offering, th e Underwriter Defendants had a duty to investors to conduct an adequate due diligence with respect to the representations in the Offering Memorandum.   The Underwriter Defendants were      reckless or negligent in perfor    ming  due diligence on the Note Offering by failing, am ong other things, to determine the legitimacy of the multiple  related  party  transactions  at  the Com pany  or  to as certain  the  true  valu e  of  the  as sets, properties  and business of Sino-Fo   rest,  resulting  in the issuan  ce  of a m  aterially  false  and misleading Offering Memorandum.

59.     The Offering Document was signed by the Underwriter Defendants and contained both  Sino-Forest's  misleading  financial  statem ents  and the m  isleading  narrative  description of the Company and its future prospects, including the portrayal of the Company as a fast-growing, legitimate  business which followed good corp   orate  governance  practices with po sitive  future prospects for growth.  In particular, the Offering Memorandum cited the Company's competitive strengths  including, am ong  others,  the  following:    (i)  "Leading commercial forest plantation operator in the PRC with establis hed track record;" (ii) "First  mover advantage with strong track record  of obtaining and developi  ng  commercial  tree plan tations  and ability to leverage our industry  foresight;" (iii) "Future growth supporte   d by long-term  master  agreements  at agreed capped  prices;"  (iv) "Strong re    search  and developm ent  capability,  with extensive forestry management expertise in the PRC;" and (v) "Diversified revenue and asset base."

60.     As  described above, the statem  ents  in  the  Offering Docum ent  were m aterially false and misleading because, contrary to the financial results reported in its financial statements, and contrary to the description of Company with  major strengths as a fore st plantation operator, the  Company  was engaged in fraudulent practices    ,  resulting in the overstatem  ent  of assets, revenues and earnings, and misleading statements about its contractual relationships with certain

parties in th e PRC related to th e purchase of timber acreage. Thus, at the tim e of the Note Offering, investors were m isled because the C ompany's actual financial condition and future prospects were much worse than these public statements indicated.

### F.     Misrepresentations and Omissions Relating to Code of Business Conduct

61.     At all material times, Sino-Forest maintained it had in place a Code of Business Conduct (the "Code"), which governed its em ployees, officers and directors. The full text of the code was posted on the Com pany's Internet site and available to inves tors. It s tated that th e members of senior m anagement "are expected to lead according to high standards of ethical conduct, in both words and actions." The Code further required that Sino-Forest representatives act in the b est interests of shareholders, th at corporate opportunities not be used for personal gain, that insiders not trade in Sino-Forest s ecurities based on undisc losed knowledge stemming from their position or employm ent with Sino-Forest, that the Com pany's books and records be honest and accurate, th at conflicts of interest b e avoided, and th at any violations o r suspected violations of the Code, and any concerns rega rding accounting, financial statement disclosure, internal accounting or disclosure controls or auditing matters, be reported.

62.     Nonetheless, as explained in this Co mplaint, the publicly disclosed Code contained materially false and misleading statements because, as described herein, Sino-Forest's top executives did not actually follow the provisions of the Code.

## V.     INITIAL DISCLOSURE OF FRAUD AT SINO-FOREST

63.     A report published on June 2, 2011 by Muddy Wa ters (the "Report"), a research firm that sp ecializes in analyzing C hinese companies traded in the Un ited States and Canada, reported that Sino-Forest and its financial statements were permeated by fraud.

64.     The Report detailed the extensive investigative effort and resources that Muddy Waters had undertaken to discover the truth about the Company:

> In order to conduct our research, we utilized a team of 10 persons who dedicated most to all of their time over two months to analyzing [Sino-Forest]. The team included professionals who focus on China from the disciplines of accounting, law, finance, and manufacturing. Our team read over 10,000 pages of documents in Chinese pertaining to the company. We deployed professional investigators to five cities. We retained four law firms as outside counsel to assist with our analysis.

65.     The Muddy Waters report concluded that the Company was extensively involved in business practices that were "blatantly illegal" and that the Company's financial statements and other reports to investors were permeated by fraud. According to the Report, Sino-Forest's remarkably consistent growth during the Class Period was illusory – simply the result of "a Ponzi scheme," rather than a real expansion in Sino-Forest's business. According to Muddy Waters, the Company used its supposed growth and profitability to raise money from private lenders and the financial markets. This money, in turn, was used to bolster an appearance of further growth and increased profitability, which in turn opened the door to additional funding from private lenders and the capital markets. According to the Report, however, the capital raised by Sino-Forest was not used to expand the Company's business, but was instead largely siphoned off by insiders in undisclosed related party transactions.

66.     At the heart of the misconduct at Sino-Forest, according to Muddy Waters, is the Company's use of AIs. The Report noted that AIs apparently act as both buyers and sellers in Sino-Forest transactions. For example, in one case uncovered by Muddy Waters, an AI purchased logs from Sino-Forest and delivered them to a chipping facility. Once the logs reached the facility they were sold back to Sino-Forest. Sino-Forest then turned around and sold the logs back to the AI who then proceeded to turn the logs into wood chips. The purpose of

these transactions, which were pointless from      a business perspective, was to create th      e appearance of additional revenue for Sino-Forest.

67.      The Report also disclosed that S   ino-Forest had vastly overstated its forestry assets. In China's Yunn an Province alone the overstatement is potentially hundreds of m illions of dollars. As noted above, in March 2007 Sino-Fo   rest publicly announced that it had entered into an agreem ent to purchase up to 200,000 hectar   es of trees in Lincang City in Yunnan for $700 million to $1.4 billion, bu t a review of re levant government documents by Muddy W aters indicated that the actual size of this purchase was about 40,000 hectares.

68.      Furthermore, although Sino-Forest gene rally does not iden tify the com panies from which it purchases forestry assets, Mudd   y Waters was able to identify m   any of these companies by means that included careful review of government records. Muddy W aters visited many of these entities, finding that they "general ly operated out of apartm ents while purportedly each doing annual revenue in the hundreds of m    illions from TRE [Sino-Forest] alone." This discovery supports Muddy Waters' conclusion that a substantial portion of the Com      pany's reported purchases of forestry assets were greatly exaggerated or never occurred at all.

69.      The Report also noted that Sino-Forest ha   d engaged in substantial transactions with undisclosed related parties, transactions which are in vio lation of the applicable accounting rules and which require disclosu   re of related party transacti   ons. An exam   ple is J iangxi Zhonggan Industrial Developm ent Company Ltd., whic h was incorporated just m onths before Sino-Forest entered into an approximately $700 million contract with it in June 2009 . The legal representative and President of this company is Sino-Forest Executive Vice President, Lam Hong Chiu. According to Muddy W aters, Zhonggan's 2008 and 2009 audit report shows "num  erous large transactions between the Company, TRE,   and other parties." Separately, Muddy W aters

identified Huaihua Yuda Wood Company Ltd., as "an undisclosed TRE subsidiary that has been receiving massive amounts of money from TRE's subsidiaries."

70.     On publication of the Muddy Waters Report, the price of Sino-Forest's securities dropped dramatically.  On June 2, 2011, the Company's shares, which had ended trading at $18.64 on June 1, ended trading on the OTC market at $7.33 and then fell further, to $5.41 on June 3, a price drop of 71% over two days on substantially larger volume than normal.  The prices of the Company's debt securities also declined significantly.

## VI.     SINO-FOREST'S DENIALS AND FURTHER MISLEADING STATEMENTS

71.     Soon after publication of the Muddy Waters Report, Defendants began an organized campaign to further mislead investors by falsely claiming that there was no misconduct at the Company.  These misleading statements (¶¶ 72-76) continued to prop up the prices of Sino-Forest securities until trading was halted on August 26, 2011.

72.     In a June 3, 2011 press release, the Company asserted that "[t]he Board of Directors and management of Sino-Forest wish to state clearly that there is no material change in its business or inaccuracy contained in its corporate reports and filings that needs to be brought to the attention of the market.  Further we recommend shareholders take extreme caution in responding to the Muddy Waters report."  The release also quoted Chan as saying the following: "let me say clearly that the allegations contained in this report [by Muddy Waters] are inaccurate and unfounded."  The release quoted Horsley as saying "I am confident that the [Sino-Forest Board of Directors'] independent committee's examination will find these allegations to be demonstrably wrong."

73.     In a June 6, 2011 press release, Sino-Forest further stated that "The Company believes Muddy Waters' report to be inaccurate, spurious and defamatory."  The press release

quoted Chan as saying the following: "I stand by our audited financial statements, including the revenue and assets shown therein. All material related party transactions are appropriately disclosed in our financial statements. We do business with the parties identified in the report at arm's length. Those parties are not related or connected to the Company or any of its management."

74.     During a June 14 conference call with investors, Chan suggested that the Muddy Waters allegations were entirely inaccurate, accusing Muddy Waters of a "pattern of sloppy diligence and gross inaccuracy."

75.     Moreover, even after the release of the Muddy Waters Report, the Sino-Forest Defendants continued their practice of making false and misleading statements about Sino-Forest's financial condition and future prospects. On both June 14, 2011 and August 15, 2011, Sino-Forest filed, respectively, its Interim Financial Statements and its MD&A covering the first quarter. These filings (which investors were later told they should not rely upon) contained material misrepresentations and omissions similar to those made in filings earlier in the Class Period: they falsely portrayed the Company as a fast-growing, legitimate business which followed good corporate governance practices with positive future prospects for growth and they materially overstated the Company's revenue, earnings and assets.

76.     The August 15, 2011 MD&A also made the following false statement: "[u]nder the master agreement entered in March 2007 to acquire 200,000 hectares of plantation trees over a 10-year period in Yunnan, the Company has actually acquired 230,200 hectares of plantation trees for $1,193,459,000 as at March 31, 2011." In fact, as the Muddy Waters Report had disclosed, the Company had vastly overstated the value of its holdings in Yunnan under the March 2007 agreement.

VII.   **CONFIRMATION OF THE FRAUD**

77.   After publication of the Muddy Waters Re   port, additional investigations and disclosures evidence th at numerous statements by Sino-Forest during the Class Period were materially false and misleading or omitted material information.

A.   ***The Globe and Mail* Investigation**

78.   A June 18, 2011 article in the highly resp ected Globe and Mail, Canada's largest-circulation national newspaper, confirmed that Sino-Forest had provided materially inaccurate information about the Company's holdings in Y unnan, which comprised a substantial portion of the Company's supposed forestry assets.  The article stated, in part:

> The Globe's investigation raises particularly hard questions about a key agreement in March, 2007, that Sino-Forest says gave it the right to buy tim ber rights for up to 200,000 he ctares of for est in Yunnan over a 10-year period for between $700-million (U.S.) and $1.4-billion.  The trees were to   be bought through a series of agreements with an entity call ed Gengma Dai and W a Tribes Autonomous Region F orestry Co. Ltd., also known as Gengm   a Forestry.
>
> The company says it h as fulfilled virtually all of the agre ement with Gengma and now owns mo   re than 200,000   hectares in Yunnan.
>
> But officials with Gengm   a Forestry, including the chairm   an, dispute the company's account of the deal, telling *The Globe and Mail* that the actual numbers are much smaller.

79.   *The Globe and Mail* article reported that in an interview with officials involved in the Sino-Forest transactions indicated that it had acquired le ss than 14,000 hectares.  The article went on to say:

> Mr. Xie's account corrobor ates the assertions of senior forestry officials in the province.  Speaking on condition of anonym   ity, these officials challenged the company's statements that it controls more than 200,000 hectares of Yunnan trees, and said they are now investigating.

80.     *The Globe and Mail* further reported:

> In a written response to questions from The Globe, Sino-Fores t said it stands by its public statem ents regarding its Y unnan holdings. The com pany said it has purchased about 13,300 hectares of 'forestry assets and leased land' directly from Gengma Forestry, and another 180,000 hectar es of 'forestry assets only' from other sellers, using Gengma as a purchasing agent.
>
> **'The agreement has not been yet fulfilled as we have not completed the purchase of 200,000 hectares,' the company said.[2]**
>
> **That statement from Sino-Forest appears to contradict its own publicly filed financial reports. In its first quarter 2011 report, the company said that 'under the master agreement entered in March 2007 to acquire 200,000 hectares of plantation trees over a 10-year period in Yunnan, the Company has actually acquired 230,200 hectares of plantation trees for $1,193,459,000 as at March 31, 2011.'**
>
> The company's 2010 annual information form filed with regulators earlier this year said that as of December 31, 2010, Sino-Forest had 'acquired approximately 190,300 hect ares of plantation trees for $925.9-million (U.S.) under the terms of the master agreement.'
>
> **The Globe's investigation of the company's dealings and holdings in Yunnan points to inconsistencies in the company's accounting of its timber rights and raises broader questions about its business practices.**

81.     In addition, it was reported that:

> As of the end of 2010, the com pany claimed control of about 800,000 hectares of trees in nine Chinese provinces plus New Zealand. Its operation in Yunnan province, in addition to being its largest, is also the one for which it has made additional disclosures recently in an attempt to defuse the allegations made in the Muddy Waters report.
>
> So far, however, it has disclosed purchase agreements as well as forest and woodland rights certific ates for about 7,000 hectares of forest in Yunnan. **The company has not disclosed significant**

---

[2] Unless otherwise indicated, all emphasis in quotations is added.

**documentation regarding its forestry holdings in other provinces.**

To find Gengma Forestry, Sino-Forest's local partner in the so-called 'Yunnan master agreement' – the 2007 deal said to be worth as much as $1.4-billion – you have to duck down an alleyway behind the drugstore on the main street of this nondescript trading city, then up a dusty cement staircase.

On the landing is the litter-strewn office with an open door and a window protected by metal bars. Despite signing a deal with Sino-Forest that should guarantee a windfall, the company has clearly fallen on hard times. 'Our relations with [Sino-Forest] were not totally good. They talked about a lot of things, but in the end it was hard to get money from them,' said Zhang Ling, Gengma Forestry's office manager.

82.     Statements of local officials in Yunnan province also contradict the reported size

of Sino-Forest's holdings:

Senior forestry officials in the province challenged the company's assertion that it controls about 200,000 hectares of forest in the region. Speaking on condition they not be identified, they said their records showed Sino-Forest manages far less than that and said the Yunnan Forestry Bureau would begin an investigation aimed at determining the company's true holdings.

83.     Not only have the size of the holdings been questioned, but so has the value as

reported in *The Globe and Mail*:

In addition to the questions about Sino-Forest's disclosures on the size of its holdings, forestry officials, as well as local timber brokers who spoke to The Globe raised questions regarding the value Sino-Forest attributes to its Yunnan assets.

'It's very hard for anyone to say what the value of their property is,' said one forestry official, adding that forested land in Yunnan needed to be evaluated by a special body jointly appointed by the Forestry Bureau and the Ministry of Finance. Sino-Forest has not requested such an official valuation of its land, he said. '(The valuation) must have two chops (official seals) and two forestry resource evaluation experts and two licensed evaluators…. Even I can't just go there and give it a value.'

84.     Subsequently, in early September 2011, *The Globe and Mail* reported that "A Globe investigation, based on interviews with   people associated with Sino-Forest and an examination of legal and regulatory docum   ents in Hong Kong and m   ainland China, has uncovered a pattern of questionable deals and disclosures from the company that date back to its earliest days."

## B.     Investigations and Regulatory Actions

85.     On August 26, 2011 the Ontario Stock Comm ission issued a "Temporary Order" that said the following: "Sino-Forest and certain of its officers and   directors including Chan appear to be engaging or participating in acts,    practices or a course of conduct related to its securities which it and/or th ey know or reasonably   ought to know perpetuate a fraud on any person or company contrary to se ction 126.1 of the [Ontario Securi ties] Act and contrary to the public interest."

86.     The Commission halted trading in Sino- Forest's stock on the Toronto Stock Exchange effective August 26, 2011 and dem   anded that several of Sino- Forest's executives resign.  Trading was halted in the U.S. on th  e OTC Bulletin Board at 5:30 p.m . on August 26, 2011.

87.     On August 28, *The Globe and Mail* reported that CEO Chan had resigned.  The newspaper also reported that "[t]hree Sino-Forest-Forest vice-presidents – Alfred Hung, George Ho and Simon Yeung – have been p laced on administrative leave.  Senior vice-president Albert Ip has been relieved of most of  his duties but remains with the Company to assist the internal probe."  The newspaper also explained why Ch   an's departure had occurred:  "According to people familiar with the case, Mr. Chan was confronted by company officials in Hong Kong last week after a review of e-m  ail accounts outside the com pany's network revealed questionable

transactions and money transfers."  Despite this evidence of m isconduct, Chan remains with the Company, having been granted the title "Founding Chairman Emeritus.''

88.    In  late August Standard & Poor's Ra     tings  Services announced that it was withdrawing its ratings o n the Company's debt because "[r]ecent developments point towards a higher likelihood that allegations of fraud at the company will be substantiated."

89.    As a result of the suspension in the  trading of Sino-Forest's common stock and disclosure of the suspected fraud, the shares are now virtually worthless and the value of its Debt Securities, including the 2017 Notes have declined substantially.  On November 11, 2011, it was announced that the Royal Canadian Mounted Police had commenced a criminal investigation.

90.    Subsequently, on January 10, 2012, Sino-Fore st announced that investors should no  longer rely upon its historical   financial statements and related audit reports.  The Com pany stated that there was "no assurance" that it would be able to release third quarter financial results or  audited financial statem ents for its 2011 fiscal  year.  The Com pany further disclosed in the January 10, 2012 announcement that it was still unabl e to explain or resolve outstanding issues, relating to its financial results and business relationships, including matters raised by documents identified by its auditor E&Y and the OSC.

## VIII.   MOTIVATION FOR FRAUD

91.    The Sino-Forest Defendants had ample motive to commit fraud: the exaggerated revenue, earnings and assets allowed the Com pany to continue to raise substantial funds fro  m lenders and investors, inflated   the Com pany's  stock price a nd  provided a personal financial windfall to the Individual Defendants who sold highly inflated stock to unsuspecting investors.

92.    In addition to the billions of dollars raised by Sino-Forest du ring the Class Period (described  above), Company insiders also bene   fited  directly by the in   flated  value of Sino-

Forest's stock because of their substantial stock holdings and because part of their compensation was in the form of stock options. Documents filed by the Company revealed that the Individual Defendants have sold over $44 million of Company stock since 2006.

**Defendants' Sales Of Shares During Class Period**

| Defendant | Net Shares Sold | Value $Can | Value $U.S.<br>(on 11/15/11<br>$Can 1 =$US 0.98494) |
|---|---|---|---|
| Chan | 182,000.00 | $3,003,200.20 | $2,957,970 |
| Horsley | 531,431.00 | $11,157,962.93 | $10,989,900 |
| Poon | 3,037,900 | $30,054,387.32 | $29,601,800 |
| **TOTAL** | **3,751,331** | **$44,215,550.45** | **$43,549,670** |

## IX.    CLASS ALLEGATIONS

93.    Plaintiffs bring this action on their own   behalf and, pursuant to Article 9 of the New York Civil Practice Law and Rules ("CPLR"), as a class action on behalf of themselves and all persons or entities who purchased (i) Sino-Forest's common stock during the Class Period on the OTC market who were damaged thereby; and (ii) all persons or entities who, during the Class Period, purchased Debt Securities  issued by Sino-Forest other th an in Canada and who were damaged thereby. Excluded from  the Class are  Defendants, the officers and directors of Sino-Forest  during  any por tion  of  the Class Per iod,  members  of  the  imm ediate  families  of  the foregoing persons and the legal rep resentatives, heirs, successors or assigns of such persons and any  entity in which any Def  endant has or had a   controlling  interest.  The Class specif  ically excludes any investor who purchased Sino-Forest securities on the Toronto Stock Exchange or in Canada.

94.    The claims of Plaintiffs and the m embers of the Class have a comm on origin and share  a com mon basis.  The claim  s of all Cl ass Members originate  from  the same im proper conduct and arise from   securities purchases entere d  into on the basis of    the sam e  materially

misleading statements and omissions by Defendants during the Class Period. If brought and prosecuted individually, each Class Member would necessarily be required to prove their respective claims upon the same facts, upon the same legal theories and would be seeking the same or similar relief, resulting in duplication and waste of judicial resources.

95.    The members of the Class are so numerous that joinder of all members is impracticable. Although all Class Members cannot be identified without discovery, Plaintiff believes that there are many thousands of class members. Sino-Forest has over 246 million shares outstanding which actively traded on the OTC market (as well as in Canada on the Toronto Stock Exchange) and there are approximately $1.8 billion in Debt Securities outstanding including, approximately, $600 million in 2017 Notes.

96.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.    Whether Defendants made materially false and misleading statements or omissions;

b.    Whether Defendants engaged in any acts that operated as a fraud or deceit, or negligently misrepresented the Company's financial condition to the Class;

c.    Whether Defendants breached their fiduciary duties to Plaintiffs and the class or were negligent in the performance of their duties;

d.    Whether Defendants' acts proximately caused injury to the Class or irreparably harmed the Class, and if so, the appropriate relief to which the Class is entitled; and,

e.    Whether Defendants' acts constitute violations of law for which the Class is entitled to recover damages or other relief.

97.    The prosecution of separate actions by individual members of the Class would also create a risk of inconsistent or varying ad judications with respect to individual members of the Class which would establish incompatible rights and standa rds of conduct for the parties involved in this case. The prosecution of sepa rate actions by individual m embers of the Class would also create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other m embers of the Class or substantially impair or impede their ability to protect their interests.

98.    Plaintiffs have engaged counsel experien ced in complex class litigation and will fairly and adequately represent the inte rests of the Class. Plaintiffs' interes ts are co-extensive with and not antagonistic to those of the absent members of the Class.

99.    The members of the Class cannot reasonabl y be expected to litigate this m atter individually. Whether litigated individually or as a class, the causes of action asserted in this Complaint involve complex issues of law and w ill likely require ex tensive and costly factual discovery, especially if this case proceeds to trial. The co sts of successfully pros ecuting such litigation will likely be beyond the resources of most members of the Class.

## X.    APPLICATION OF THE FRAUD ON THE MARKET PRESUMPTION

100.    During the Class Period, Sino-Forest was a high profile Company which regularly provided purportedly accurate inform ation to investors about the Company's operations. The Company was followed by num erous securities anal ysts. The securities at is sue, Sino-Forest common stock and debt securities, were activ ely traded on efficient m arkets and publicly disclosed information about the Company was incorporated in the price of these securities within a reasonable amount of time.

**A.**   **Common Stock**

101.   During the Class Period, Sino-Forest   common stock was traded on  the OTC market in the United States, which is an open, we ll-developed and efficient market.  Sino-Forest common stock was traded on the Toronto Stock Exchange, an open, well developed and efficient market. There was a sub stantial volume of trading in both the United S tates and Canada and the price of the shares traded in the United States was affected in the same way as the price of shares traded in Canada.

102.   The OTC market has no fixed location but investors throughout the United States, including in New York County, New York, can      purchase OTC securities through registered brokers.  The principal regulat  or of the OTC m  arket is th e  Financial Industry Regulatory Authority which has its principal offices in New York, NY and Washington, DC.

**B.**   **2017 Notes and Other Debt Securities**

103.   According to the Com pany, the 2017 No tes "offering wa s made on a private placement basis in C  anada, the United States   and  internationally pursuant to availab  le exemptions, through a syndicate of initial purchasers." The indenture agreem ent which governs the 2017 Notes provided that the notes are governed by New York law.

104.   The 2017 Notes were initially purchased by  the Underwriter Defendants.  In the purchase agreement  between the Underwriter De  fendants and Sino-F orest, Banc of Am erica Securities LLC listed its address as One Bryant  Park, New York, NY 1 0036 and Credit Suisse Securities (USA) LLC listed it  s address as E leven Madison Avenue New York, NY 10010. During the Class Period and after their issuance there was an efficient market for the 2017 Notes.

105.   The  2017 Notes could only be legally sold       to non-U.S. persons and to U.S. persons who were qualified institutional buyers.  There is an open and well developed market for

such securities which are issued by large an    d well known issuers such as Sino-Forest and, specifically, there was an active and well-developed market for the 2017 Notes and Sino-Forest's other Debt Securities during the C  lass Period.    Class Mem bers were able to p urchase 2017 Notes and other Debt Securities in the OTC market.

106.    Accordingly, Class Members who purchas ed Sino-Forest common stock or 2017 Notes, and other Debt Securities in the secondary market are entitled to a presumption of reliance on the accuracy of the prices paid.

## XI.    CAUSES OF ACTION

### COUNT ONE
### AGAINST SINO-FOREST AND THE INDIVIDUAL DEFENDANTS FOR FRAUD

107.    Plaintiffs repeat and reallege each of the allegations set forth in above.  This claim is asserted against Sino-Forest and the Individual Defendants for common law fraud.

108.    As set forth herein, Sino-Forest and     the Individual Defendants knowingly or recklessly engaged and participated in a continuous c ourse and scheme of fraudulent conduct to disseminate materially false in formation about Sino-Forest's fi nancial condition or failed to disclose material information with the purpose of inflating the  prices of Sino-Forest's common stock, the 2017 Notes and Sino-Fore st's other debt securities.   As intended by the Sino-Forest Defendants, Plaintiffs and Class Mem bers reasonably relied on thes e false an d misleading statements and failures to disclose and suffered substantial damages as a result.

109.    As a direct and proxim ate result of Si no-Forest and the Individual Defendants' fraud, Plaintiffs and the Class have suffered econo mic losses in an am ount to be determ ined at trial.  Sino-Forest and the Indi vidual Defendants are jointly and se verally liable to the Class for common law fraud.

**COUNT TWO**
**AGAINST SINO-FOREST AND THE INDIVIDUAL DEFENDANTS FOR CIVIL**
**CONSPIRACY TO DEFRAUD**

110.    Plaintiffs repeat and realleg e each of th e allegations set above. This claim   is asserted against Sino-Forest and the Individual Defendants for civil conspiracy to commit fraud.

111.    In furtherance of a schem  e to defr aud investors, the Sino-Forest Def endants corruptly agreed to combine their respective skills, expertise, resources, and reputations, thereby causing injury to Plaintiffs and the Class.

112.    As set forth in detail above, one or         more of the conspirators m  ade false representations of material facts, with sc ienter, and Plain tiffs' and Class Mem bers justifiably relied upon these misrepresentations and were injured as a result.

113.    As a direct and proxim ate consequence of the foregoing, Plaint iffs and the Class have suffered economic losses in an am ount to be determined at trial.  Because Sino-Forest and the Individual Defendants conspired am  ongst themselves and with others   to carry out this fraudulent scheme, the Sino-Forest Defendants are jointly and severally liable both for their own knowledge and conduct and for the knowledge a          nd conduct of their co-conspirators in furtherance of the fraud.

**COUNT THREE**
**AGAINST SINO-FOREST AND THE INDIVIDUAL DEFENDANTS FOR AIDING AND**
**ABETTING FRAUD**

114.    Plaintiffs repeat and reallege each of the allegations set forth above.  This claim is asserted against Sino-Forest and the Individu al Defendants for aiding and abetting common law fraud.  The Sino-Forest Defendants  were aware of the fraudulent sc heme that is the subject of this Complaint and each of these Defendants pro vided substantial assistance to the p erpetrators of this scheme.

115.    As a direct and proxim ate result of  the Sino-Forest Defendants' aiding and abetting of the fraud, Plaintiffs  and the Class have suffered econom ic losses in an amount to be determined at trial.  Sino-Forest and the Individual Defendants are jointly and severally liable to the Class for aiding and abetting common law fraud.

**COUNT FOUR**
**AGAINST SINO-FOREST FOR UNJUST ENRICHMENT**

116.    Plaintiffs repeat and reallege each of the allegations set forth above.  This claim is asserted against Sino-Forest for unjust enrichment.

117.    In connection with the fraudulent schem e set out in this Com plaint Defendant Sino-Forest received payment for the sale of the 2017 Notes.   Defendant Sino-Forest would not have been able to sell the 2017 Notes or would only  have been able to sell these notes at a lower price  had the true facts about Sin     o-Forest's  business  and  financial condition been known. Consequently, Sino-Forest unjustly received money from the purchasers of its secu rities and it would  be unjust to allow Sino-Forest to keep      this im properly  earned m oney  and should be required to repay it.

**COUNT FIVE**
**AGAINST E&Y FOR BREACH OF FIDUCIARY DUTY**

118.    Plaintiffs repeat and reallege each of the allegations set forth above.  This claim is asserted  against the E&Y Defendants for breach      of  fiduciary duties.   Plaintiffs  specifically disclaim any allegation of fraud or fraudulent intent of E&Y with respect to this count.

119.    The  E&Y Defendants had a fiduciary re      lationship  to Plaintiffs and Class Members in that the E&Y Defendants owed Plaintiffs and Class Members a duty of ordinary and reasonable care and good faith which arose from  the relationships between the E&Y Defendants

and the Plaintiffs and Class Members who were the intended users of the financial statements certified by the E&Y Defendants.  The E&Y   Defendants breached these fiduciary duties by certifying materially false and  misleading financial statements, having known of the material misstatements or omissions, or having failed to  do reasonable due diligence which would have discovered the false and misleading nature of these financial statements.

120.    The E&Y Defendants breached the ir fiduciary duties to P laintiffs by failing to perform their audits of Sino-Fore st's final statements in accordance with Canadian GAAS by   , *inter alia*, failing to o btain competent evidentiary material in sup port of the Com pany's representations in its financial statements and E&Y's audit opinion.

121.    As a direct and proximate result of the E&Y Defendants' breach of fiduciary duty, Plaintiffs and the Class have suffered economic losses in an amount to be determined according to proof at trial.  The E&Y Defendants are jointly and severally liable to the Class for breach of fiduciary duty.

<u>**COUNT SIX**</u>
<u>**AGAINST E&Y FOR NEGLIGENT MISREPRESENTATION**</u>

122.    Plaintiffs repeat and reallege each of the allegations set forth above.  This claim is asserted against the E&Y Defenda nts for negligent m isrepresentation.  Plaintiffs specifically exclude any allegations of fraud or fraudulent intent of E&Y with respect to this count.

123.    The E&Y Defendants had a special relati onship of trust and confidence with Plaintiffs and Class Members because of their status as outside auditors of Sino-Forest that gave rise to a duty to exercise due care in the perf ormance of their duties.  These Defendants knew or were reckless in not knowing that Plaintiffs and Class Members were relying on them to exercise reasonable care in the performance of their duties.

41

124.    As set forth herein, the E&Y Defendants  negligently made false and misleading statements that inflated the price of Sino-Fores t's securities, including by negligently failing to disclose material information they were obligated to disclose.  The E&Y defendants negligently misrepresented to Plaintiffs and Class Members that they had performed audits of Sino-Forest's financial Statements in accordance with Cana  dian GAAS and that the Co  mpany's financial statement were properly presented in accordance with Canadian GAAP.

125.    Plaintiffs and Class Members reaso  nably relied on these false and m  isleading statements and f ailures to dis close and suf fered substantial dam ages as a result. The E&Y Defendants were at leas t negligent in making such statements, including because they failed to conduct appropriate due diligence before making such statements by, *inter alia*, failing to obtain competent evidentiary m aterial in support of th  e Company's representations in its financial statements and E&Y audit opinion.

126.    As  a direct and proxim     ate  result of the E&Y Defendants' negligent misrepresentations, Plaintiffs and the Class have  suffered economic losses in an amount to be determined according to proof at trial.  The E& Y Defendants are jo intly and severally liable to the Class for negligent misrepresentation.

**COUNT SEVEN
AGAINST E&Y FOR GROSS NEGLIGENCE**

127.    Plaintiffs repeat and reallege each of the allegations set forth above.  This claim is asserted against the E&Y Defendants for gross ne  gligence.  Plaintiffs specifically exclude an y allegations of fraud or fraudulent intent of E&Y with respect to this count.

128.    The  E&Y Defendants had a special rela      tionship  with Plaintiffs and Class Members because of their status as outside aud itors of Sino-Forest, a relationship th at gave rise

42

to a duty to exercise due care in the performance of the E&Y Defendants' duties. The E&Y Defendants knew or were reckless in not knowing that Class Members were relying on them to exercise reasonable diligence in the performance of their duties. The E&Y Defendants were grossly negligent in the performance of their duties, including by failing to conduct adequate due diligence. The E&Y Defendants breached their finding changes to Plaintiffs by failing to perform their audits of Sino-Forest's final statements in accordance with Canadian GAAS by, *inter alia*, failing to obtain competent evidentiary material in support of the Company's representations in its financial statements and E&Y audit opinion.

129. As a direct and proximate result of the E&Y Defendants' gross negligence, Plaintiffs and the Class have suffered economic losses in an amount to be determined by proof at trial. The E&Y Defendants are jointly and severally liable to the Class for gross negligence.

**COUNT EIGHT**
**AGAINST E&Y FOR NEGLIGENCE**

130. Plaintiffs repeat and reallege each of the allegations set forth above. This claim is asserted against the E&Y Defendants for negligence. Plaintiffs specifically exclude any allegations of fraud or fraudulent intent of E&Y with respect to this count.

131. The E&Y Defendants had a special relationship with Class Members because of their status as independent auditor of Sino-Forest, a relationship that gave rise to a duty to exercise due care in the performance of the E&Y Defendants' duties. The E&Y Defendants knew or were reckless in not knowing that Plaintiffs and Class Members were relying on the E&Y Defendants to exercise reasonable diligence in the performance of their duties. The E&Y Defendants were negligent in the performance of their duties; specifically the E&Y Defendants breached their duties to Plaintiffs by failing to perform their audits of Sino-Forest's final

43

statements in accordance with Canadian GAAS, including by failing to conduct adequate due diligence by, *inter alia*, failing to obtain co mpetent evidentiary material in support of th e Company's representations in its financial statements and E&Y audit opinion.

132.    As a direct and proximate result of the    E&Y Defendants' neg ligence, Plaintiffs and the Class have suffered econo mic losses in an  amount to be determ ined by proof at trial. The E&Y Defendants are jointly and severally liable to the Class for negligence.

## COUNT NINE
## AGAINST THE UNDERWRITER DEFENDANTS FOR NEGLIGENT MISREPRESENTATION

133.    Plaintiff IMF repeats an d realleges each of  the allegations set forth abo ve.  This claim is asserted against the Underwriter Defendants for negligent misrepresentation on behalf of all Class Mem bers who purchased the 2017 Notes on    the Offering. P laintiff IMF specifically excludes any allegations of fraud  or fraudulent intent of Underwri ter Defendants with respect to this count.

134.    The Underwriter Defendants had a special relationship with IMF and those Class Members  who purchased the 2017 Notes from th    e Underwriter Defendants because of their status as underwriters, which gave  rise to a duty to exercis e due care in the performance of their duties.  The Underwriter Defendants knew or we    re reckless in no t knowing that each Clas s Member who purchased the 2017 Notes was relying   on them to exercise reasonable care in the performance of their duties.

135.    As  set forth herein, the Underwriter    Defendants  negligently m ade  false and misleading statements that inflated the price of  the 2017 Notes, including by negligently failing to  disclose  material  information  they were obliga ted  to d isclose.  Plaintif f IMF and Class Members reasonably relied on these false and misl eading statements and failures to disclose and

suffered substantial damages as a result. The U nderwriter Defendants were at least negligent in making such statem ents, including because th ey failed to conduct ap propriate due diligence before making such statements.

136.    As a direct and proxim ate result of the Underwriter D efendants' negligent misrepresentation, Plaintiffs and the members of the Class have suffered economic losses in an amount to be determined by proof at trial. The Underwriter Defendants are jointly and severally liable to the Class for negligent misrepresentation.

## COUNT TEN
## AGAINST THE UNDERWRITER DEFENDANTS FOR GROSS NEGLIGENCE

137.    Plaintiff IMF repeats an d realleges each of the allegations set above. This claim is asserted against the Underwriter Defendants for negligent m isrepresentation on behalf of all Class Members who purchased the 2017 Notes on the   Offering. Plaintiffs specifically exclude any allegations of fraud or fraudu lent intent of the Underwr iter Defendants with respect to this count.

138.    The Underwriter Defendants had a special   relationship w ith Plaintiff IMF and Class Members because of their status as underwrite rs that gave rise to  a duty to exercise due care in the performance of their duties. These Defendants knew or were reckless in not knowing that Class Members were relying on them to exercise reasonable diligence in the performance of their duties. These Defendants   were grossly negligen t in the pe rformance of their du ties, including by failing to conduct adequate due diligence.

139.    As a direct and proximate result of the Underwriter Defendants' gross negligence, Plaintiff IMF and the Class have suffered econom ic losses in an a mount to be determ ined by

proof at trial.  The Underwrite r Defendants are jointly and severa lly liable to Plaintiff IMF and the Class for gross negligence.

**COUNT ELEVEN**
**AGAINST THE UNDERWRITER DEFENDANTS FOR NEGLIGENCE**

140.    Plaintiff IMF repeats an d realleges each of  the allegations set forth abo ve.  This claim is asserted agains t the Underwriter Defenda nts for negligence on behalf of Plaintiff IMF and all Class Mem bers who purchased the 2017 No  tes on the Offering.  Plaintiff specifically excludes any allegations of fraud or fraudulent intent of the Underwriter Defendants with respect to this count.

141.    The Underwriter Defendants had a special  relationship with Class Mem bers who purchased the 2017 No tes from them because o f their status as underwriters that gave rise to  a duty to exercise due care in the perf ormance of their duties.  The Unde rwriter Defendants knew or were reckless in not knowing  that Plaintiff IMF and Cla ss Members were re lying on them to exercise reasonable d iligence in the performance of their duties.   The Underwriter Defendants were negligent in the performance of their duties, including by failing to conduct due diligence.

142.    As  a direct and proxim  ate  result of  the  Underwriter D efendants' negligence, Plaintiff IMF and the Class have suffered economic losses in an amount to be determined at trial. The  Underwriter Defendants are jointly and s everally liable to Plain tiff IMF and the Class f or negligence.

## XII.    PRAYER FOR RELIEF AND JURY DEMAND

WHEREFORE,  Plaintiffs and the Class here   by  demands  a trial by jury, and seek a judgment:

A.  Awarding Plaintiffs and the Class all compensatory damages they suffered, including lost profits and consequential and incidental damages, as a result of the wrongful conduct of the Defendants, in an amount to be determined at trial;

B.  Awarding Plaintiffs and the Class damages arising from Defendants' unjust enrichment;

C.  Awarding Plaintiffs and the Class punitive damages in an amount to be determined at trial;

D.  Awarding Plaintiffs and the Class pre-judgment and post-judgment interest;

E.  Awarding Plaintiffs and the Class their costs, expert fees, expenses and attorneys' fees incurred in connection with this action to the maximum extent permitted by law;

F.  Awarding Plaintiffs and the Class such other and further relief as the Court finds just and proper.

Dated: January 27, 2012                    Respectfully submitted,

                                           COHEN MILSTEIN SELLERS &
                                             TOLL PLLC

                                           _____
                                           Richard S. Speirs
                                           Kenneth M. Rehns
                                           88 Pine Street 14th Floor
                                           New York, NY  10005
                                           Phone:  (212) 838-7797
                                           Facsimile:  (212) 838-7745

                                                   -and-

                                           Steven J. Toll
                                           Matthew B. Kaplan
                                           1100 New York, Ave., N.W.
                                           West Tower, Suite 500
                                           Washington, D.C.  20005
                                           Phone:  (202) 408-4600
                                           Facsimile:  (202) 408-4699

                                           *Attorneys for Plaintiff and the Proposed Class*

**Exhibit A (Sino-Forest Organizational Chart)**



**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

DAVID LEAPARD and IMF FINANCE SA on their
own behalf and on behalf of all others similarly situated,

                Plaintiffs,

       v.

ALLEN T.Y. CHAN, DAVID J. HORSLEY, KAI KIT
POON, BANC OF AMERICA SECURITIES LLC,
CREDIT SUISSE SECURITIES (USA) LLC, SINO-
FOREST CORPORATION, ERNST & YOUNG
GLOBAL LIMITED, and ERNST & YOUNG LLP,

                Defendants.

))))))))))))))))

INDEX NO.

**VERIFICATION**

---

STATE OF NEW YORK    )
CITY OF NEW YORK     )
COUNTY OF NEW YORK )

      Kenneth M. Rehns, being duly sworn, states that he is one of the attorneys for Plaintiffs in this action and that the foregoing complaint is true to his own knowledge, except as to matters therein stated on information and belief and as to those matters he believes to be true; that the ground of his belief as to all matters not stated upon his knowledge are upon review of publicly available securities filings, media and newspaper articles and information contained on the Internet; and that the reason why the verification is not made by Plaintiffs David Leapard and IMF Finance SA is that these Plaintiffs are not in the county where Plaintiff's attorney has his office.

*Kenneth M. Rehns*
Kenneth M. Rehns

*Notary Public signature*
Notary Public

Sworn before me this 27th day of January, 2012

JESSE J. LEE
Notary Public, State of New York
No. 01LE6167858
Qualified in New York County
Commission Expires June 4, 2015

1

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

| | |
|---|---|
| David Leapard, et al. | ) |
| | ) |
| | ) |
| | ) |
| **Plaintiff(s)** | ) |
| | ) Case No.: 650258/2012 |
| v. | ) |
| | ) |
| Allen T.Y. Chan, et al. | ) |
| | ) |
| | ) |
| **Defendant(s)** | ) |

### AFFIDAVIT OF SERVICE

I, Mary M. Bonville, a Private Process Server, being duly sworn, depose and say, I have been duly authorized to make service of the documents listed in the above entitled case, I am over the age of eighteen years and am not a party to or otherwise interested in this matter.

DOCUMENT(S) SERVED: Summons, Notice of Commencement of Action Subect to Mandatory Electronic Filing, Verified Class Action Complaint and Exhibit A

SERVE TO: Credit Suisse Securites (USA) LLC c/o Corporation Service Compay, Registered Agent

SERVICE ADDRESS: 80 State Street, Albany, New York 12207

DATE SERVED: February 08, 2012   TIME SERVED: 2:30 PM

PERSON SERVED: Steve Pastore, Authorized Agent, authorized to accept

Described herein:
Gender: Male   Race/Skin: White   Hair: Grey   Age: 50   Height: 5'9"   Weight: 180

I do solemnly declare and affirm under penalty of perjury that the information set forth herein is correct to the best of my knowledge, information and belief.

*Mary M. Bonville*

Mary M. Bonville
CAPITOL PROCESS SERVICES, INC.
1827 18th Street, NW
Washington, DC 20009-5526
(202) 667-0050

Subscribed and sworn to before me, a notary public, on this _____ 8th _____ day of _____ February _____, 2012.

Client Reference: 75670001

ID: 12-0709

*Ruth A. Dennehey*

RUTH A. DENNEHEY
Notary Public-State of New York
Albany County No. 4729775
Commission Expires 11-30- 2014

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| David Leapard, et al. | ) |
| | ) |
| | ) |
| **Plaintiff(s)** | ) Case No.: 650258/2012 |
| | ) |
| v. | ) |
| Allen T.Y. Chan, et al. | ) |
| | ) |
| | ) |
| **Defendant(s)** | ) |

## AFFIDAVIT OF SERVICE

I, Robert DeLacy, Jr., a Private Process Server, being duly sworn, depose and say, I have been duly authorized to make service of the documents listed in the above entitled case, I am over the age of eighteen years and am not a party to or otherwise interested in this matter.

DOCUMENT(S) SERVED:  Summons, Notice of Commencement of Action Subect to Mandatory Electronic Filing, Verified Class Action Complaint and Exhibit A

SERVE TO:  Banc of America Securities LLC c/o The Corporation Trust Company, Registered Agent

SERVICE ADDRESS:  Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801

DATE SERVED:  February 08, 2012   TIME SERVED:  1:55 PM

PERSON SERVED:  Scott LaScala, Operations Manager, authorized to accept

Described herein:
Gender: Male    Race/Skin: White    Hair: Brown    Age: 35    Height: 6'0"    Weight: 230

I do solemnly declare and affirm under penalty of perjury that the information set forth herein is correct to the best of my knowledge, information and belief.

Robert DeLacy, Jr.
CAPITOL PROCESS SERVICES, INC.
1827 18th Street, NW
Washington, DC 20009-5526
(202) 667-0050

Subscribed and sworn to before me, a notary public, on this ___8th___ day of ___February___, 2012.

ID: 12-070917

Client Reference: 75670001

Notary Public                              My Commission Expires:

GIOVANNA MESSINA
MY COMMISSION
EXPIRES
JULY 9, 2012
NOTARY PUBLIC
STATE OF DELAWARE

ID: 12-070917                                                      Client Reference: 75670001

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

David Leapard, et al.                    )
                                         )
                                         )
                                         )
                    Plaintiff(s)         )
                                         )  Case No.: 650258/2012
                                         )
                    v.                   )
                                         )
Allen T.Y. Chan, et al.                  )
                                         )
                                         )
                    Defendant(s)         )

### AFFIDAVIT OF SERVICE

I, Dominic DellaPorte, a Private Process Server, being duly sworn, depose and say, I have been duly authorized to make service of the documents listed in the above entitled case, I am over the age of eighteen years and am not a party to or otherwise interested in this matter.

DOCUMENT(S) SERVED:  Summons, Notice of Commencement of Action Subect to Mandatory Electronic Filing, Verified Class Action Complaint and Exhibit A

SERVE TO:  Sino-Forest Corporation c/o Law Debenture Corporate Services Inc., Agent

SERVICE ADDRESS:  400 Madison Avenue, New York, New York 10017

DATE SERVED: February 08, 2012  TIME SERVED:  2:05 PM

PERSON SERVED:  James Heaney, Managing Director, authorized to accept

Described herein:
Gender: Male    Race/Skin: White    Hair: Black    Age: 56    Height: 5'9"    Weight: 180

I do solemnly declare and affirm under penalty of perjury that the information set forth herein is correct to the best of my knowledge, information and belief.

Dominic DellaPorte
CAPITOL PROCESS SERVICES, INC.
1827 18th Street, NW
Washington, DC 20009-5526
(202) 667-0050

Subscribed and sworn to before me, a notary public, on this ____ day of _____, 2012.

ID: 12-070893

EVAN COHAN
NOTARY PUBLIC & ATTORNEY AT LAW
NO. 02CO4998577
QUALIFIED IN ROCKLAND COUNTY
CERTIFICATE FILED IN NEW YORK COUNTY
COMMISSION EXPIRES JUNE 29, 2014

Client Reference: 75670001

_____
Notary Public

My Commission Expires:

EVAN COHAN
NOTARY PUBLIC & ATTORNEY AT LAW
NO. 02CO4998577
QUALIFIED IN ROCKLAND COUNTY
CERTIFICATE FILED IN NEW YORK COUNTY
COMMISSION EXPIRES JUNE 29, 2014

ID: 12-070893

Client Reference: 75670001